(Slip Opinion)          OCTOBER TERM, 2011          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SOUTHERN UNION CO. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 11–94.   Argued March 19, 2012—Decided June 21, 2012

Petitioner Southern Union Company was convicted by a jury in federal court on one count of violating the Resource Conservation and Recovery Act of 1976 (RCRA) for having knowingly stored liquid mercury without a permit at a subsidiary's facility "on or about September 19, 2002 to October 19, 2004." Violations of the RCRA are punishable by, *inter alia*, a fine of not more than $50,000 for each day of violation. 42 U. S. C. §6928(d). At sentencing, the probation office calculated a maximum fine of $38.1 million, on the basis that Southern Union violated the RCRA for each of the 762 days from September 19, 2002, through October 19, 2004. Southern Union argued that imposing any fine greater than the 1-day penalty of $50,000 would be unconstitutional under *Apprendi* v. *New Jersey*, 530 U. S. 466, which holds that the Sixth Amendment's jury-trial guarantee requires that any fact (other than the fact of a prior conviction) that increases the maximum punishment authorized for a particular crime be proved to a jury beyond a reasonable doubt. Southern Union contended that, based on the jury verdict and the District Court's instructions, the only violation the jury necessarily found was for one day. The District Court held that *Apprendi* applies to criminal fines, but concluded from the "content and context of the verdict all together" that the jury found a 762-day violation. The court therefore set a maximum potential fine of $38.1 million, from which it imposed a fine of $6 million and a "community service obligation" of $12 million. On appeal, the First Circuit disagreed with the District Court that the jury necessarily found a violation of 762 days. But the First Circuit affirmed the sentence because it held that *Apprendi* does not apply to criminal fines.

*Held:* The rule of *Apprendi* applies to the imposition of criminal fines. Pp. 3–16.

(a) *Apprendi'*s rule is "rooted in longstanding common-law practice," *Cunningham* v. *California,* 549 U. S. 270, 281, and preserves the "historic jury function" of "determining whether the prosecution has proved each element of an offense beyond a reasonable doubt," *Oregon* v. *Ice*, 555 U. S. 160, 163. This Court has repeatedly affirmed *Apprendi'*s rule by applying it to a variety of sentencing schemes that allow judges to find facts that increase a defendant's maximum authorized sentence. See *Cunningham*, 549 U. S., at 274−275; *United States* v. *Booker*, 543 U. S. 220, 226–227; *Blakely* v. *Washington*, 542 U. S. 296, 299–300; *Ring* v. *Arizona*, 536 U. S. 584, 588–589; *Apprendi*, 530 U. S., at 468–469. While the punishments at stake in these cases were imprisonment or a death sentence, there is no principled basis under *Apprendi* to treat criminal fines differently. *Apprendi'*s "core concern"—to reserve to the jury "the determination of facts that warrant punishment for a specific statutory offense," *Ice,* 555 U. S*.,* at 170—applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses. Fines were by far the most common form of noncapital punishment in colonial America and they continue to be frequently imposed today. And, the amount of a fine, like the maximum term of imprisonment or eligibility for the death penalty, is often determined by reference to particular facts. The Government argues that fines are less onerous than incarceration and the death sentence and therefore should be exempt from *Apprendi*. But where a fine is substantial enough to trigger the Sixth Amendment's jury-trial guarantee, *Apprendi* applies in full. Pp. 3−8.

(b) The "historical role of the jury at common law*,"* which informs the "scope of the constitutional jury right," *Ice,* 555 U. S*.,* at 170, supports applying *Apprendi* to criminal fines. To be sure, judges in the colonies and during the founding era had much discretion in determining whether to impose a fine and in what amount. But the exercise of such discretion is fully consistent with *Apprendi*, which permits courts to impose "judgment *within the range* prescribed by statute." 530 U. S., at 481 (emphasis in original). The more salient question is what role the jury played in prosecutions for offenses that pegged the amount of a fine to the determination of specified facts. A review of both state and federal decisions discloses that the predominant practice was for such facts to be alleged in the indictment and proved to the jury. The rule that juries must determine facts that set a fine's maximum amount is an application of the "two longstanding tenets of common-law criminal jurisprudence" on which *Apprendi* is based: first, "the 'truth of every accusation' against a defendant 'should afterwards be confirmed by the unanimous suffrage of twelve

of his equals and neighbours.'" *Blakely,* 542 U. S., at 301. And second, "'an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and is no accusation in reason.'" *Ibid.* Contrary to the Government's contentions, neither *United States* v. *Murphy*, 16 Pet. 203, nor *United States* v. *Tyler,* 7 Cranch 285, overcomes the ample historical evidence that juries routinely found facts that set maximum criminal fines. Pp. 8–14.

(c) The Government's remaining arguments, echoed by the dissent, are unpersuasive. The Government claims that facts relevant to a fine's amount typically quantify the harm caused by the defendant's offense, and do not define a separate set of acts for punishment. The Government contends that only the latter determination implicates *Apprendi*'s concerns. But this argument rests on the rejected assumption that, in determining the maximum punishment for an offense, there is a constitutionally significant difference between a fact that is an "element" of the offense and one that is a "sentencing factor." Further, the facts the District Court found in imposing a fine on Southern Union are not fairly characterized as merely quantifying the harm the company caused.

The Government also argues that applying *Apprendi* to criminal fines will prevent States and the Federal Government from enacting statutes that calibrate the amount of a fine to a defendant's culpability. But legislatures are free to enact such statutes, so long as the statutes are administered in conformance with the Sixth Amendment.

Finally, the Government contends that requiring juries to determine facts related to fines will cause confusion, prejudice defendants, or be impractical. These policy arguments rehearse those made by the dissents in our prior *Apprendi* cases. They must be rejected because the rule the Government espouses is unconstitutional. In addition, because *Apprendi* is now more than a decade old, the reliance interests underlying the Government's arguments are by this point attenuated. Pp. 14–16.

630 F. 3d 17, reversed and remanded.

SOTOMAYOR, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, GINSBURG, and KAGAN, JJ., joined. BREYER, J., filed a dissenting opinion, in which KENNEDY and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–94

SOUTHERN UNION COMPANY, PETITIONER *v.*
UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 21, 2012]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

The Sixth Amendment reserves to juries the determination of any fact, other than the fact of a prior conviction, that increases a criminal defendant's maximum potential sentence. *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000); *Blakely* v. *Washington*, 542 U. S. 296 (2004). We have applied this principle in numerous cases where the sentence was imprisonment or death. The question here is whether the same rule applies to sentences of criminal fines. We hold that it does.

I

Petitioner Southern Union Company is a natural gas distributor. Its subsidiary stored liquid mercury, a hazardous substance, at a facility in Pawtucket, Rhode Island. In September 2004, youths from a nearby apartment complex broke into the facility, played with the mercury, and spread it around the facility and complex. The complex's residents were temporarily displaced during the cleanup and most underwent testing for mercury poisoning.

In 2007, a grand jury indicted Southern Union on mul-

tiple counts of violating federal environmental statutes. As relevant here, the first count alleged that the company knowingly stored liquid mercury without a permit at the Pawtucket facility "[f]rom on or about September 19, 2002 until on or about October 19, 2004," App. 104, in violation of the Resource Conservation and Recovery Act of 1976 (RCRA). See 90 Stat. 2812, as amended, 42 U. S. C. §6928(d)(2)(A). A jury convicted Southern Union on this count following a trial in the District Court for the District of Rhode Island. The verdict form stated that Southern Union was guilty of unlawfully storing liquid mercury "on or about September 19, 2002 to October 19, 2004." App. 140.

Violations of the RCRA are punishable by, *inter alia*, "a fine of not more than $50,000 for each day of violation." §6928(d). At sentencing, the probation office set a maximum fine of $38.1 million, on the basis that Southern Union violated the RCRA for each of the 762 days from September 19, 2002, through October 19, 2004. Southern Union objected that this calculation violated *Apprendi* because the jury was not asked to determine the precise duration of the violation. The company noted that the verdict form listed only the violation's approximate start date (*i.e.,* "on or about"), and argued that the court's instructions permitted conviction if the jury found even a 1-day violation. Therefore, Southern Union maintained, the only violation the jury necessarily found was for one day, and imposing any fine greater than the single-day penalty of $50,000 would require factfinding by the court, in contravention of *Apprendi*.

The Government acknowledged the jury was not asked to specify the duration of the violation, but argued that *Apprendi* does not apply to criminal fines. The District Court disagreed and held that *Apprendi* applies. But the court concluded from the "content and context of the verdict all together" that the jury found a 762-day violation.

App. to Pet. for Cert. 46a. The court therefore set a maximum potential fine of $38.1 million, from which it imposed a fine of $6 million and a "community service obligatio[n]" of $12 million. App. 154.

On appeal, the United States Court of Appeals for the First Circuit rejected the District Court's conclusion that the jury necessarily found a violation of 762 days. 630 F. 3d 17, 36 (2010). But the Court of Appeals affirmed the sentence because it also held, again in contrast to the District Court, that *Apprendi* does not apply to criminal fines. 630 F. 3d, at 33–36. Other Circuits have reached the opposite conclusion. See *United States* v. *Pfaff*, 619 F. 3d 172 (CA2 2010) *(per curiam)*; *United States* v. *LaGrou Distribution Sys., Inc.*, 466 F. 3d 585 (CA7 2006). We granted certiorari to resolve the conflict, 565 U. S. \_\_\_ (2011), and now reverse.

## II

### A

This case requires us to consider the scope of the Sixth Amendment right of jury trial, as construed in *Apprendi*. Under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U. S., at 490. The "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U. S., at 303 (emphasis deleted). Thus, while judges may exercise discretion in sentencing, they may not "inflic[t] punishment that the jury's verdict alone does not allow." *Id.,* at 304.

*Apprendi*'s rule is "rooted in longstanding common-law practice." *Cunningham* v. *California*, 549 U. S. 270, 281 (2007). It preserves the "historic jury function" of "determining whether the prosecution has proved each element

of an offense beyond a reasonable doubt." *Oregon* v. *Ice*, 555 U. S. 160, 163 (2009). We have repeatedly affirmed this rule by applying it to a variety of sentencing schemes that allowed judges to find facts that increased a defendant's maximum authorized sentence. See *Cunningham*, 549 U. S., at 274–275 (elevated "upper term" of imprisonment); *United States* v. *Booker*, 543 U. S. 220, 226–227, 233–234 (2005) (increased imprisonment range for defendant under then-mandatory Federal Sentencing Guidelines); *Blakely*, 542 U. S., at 299–300 (increased imprisonment above statutorily prescribed "standard range"); *Ring* v. *Arizona*, 536 U. S. 584, 588–589 (2002) (death penalty authorized upon finding existence of aggravating factors); *Apprendi*, 530 U. S., at 468–469 (extended term of imprisonment based on violation of a "hate crime" statute).

While the punishments at stake in those cases were imprisonment or a death sentence, we see no principled basis under *Apprendi* for treating criminal fines differently. *Apprendi*'s "core concern" is to reserve to the jury "the determination of facts that warrant punishment for a specific statutory offense." *Ice*, 555 U. S., at 170. That concern applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses. Fines were by far the most common form of noncapital punishment in colonial America.[1] They are frequently imposed today, especially

_____

[1] See Preyer, Penal Measures in the American Colonies: An Overview, 26 Am. J. Legal Hist. 326, 350 (1982) (hereinafter Preyer); see also Lillquist, The Puzzling Return of Jury Sentencing: Misgivings About *Apprendi*, 82 N. C. L. Rev. 621, 640–641 (2004) (hereinafter Lillquist); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 290 (1989) (O'Connor, J., concurring in part and dissenting in part) (fines were "the preferred penal sanction" in England by the 17th century). "Imprisonment," in contrast, "although provided for as a

upon organizational defendants who cannot be imprisoned.[2] And the amount of a fine, like the maximum term of imprisonment or eligibility for the death penalty, is often calculated by reference to particular facts. Sometimes, as here, the fact is the duration of a statutory violation;[3] under other statutes it is the amount of the defendant's gain or the victim's loss, or some other factor.[4] In all such cases, requiring juries to find beyond a reasonable doubt facts that determine the fine's maximum amount is necessary to implement *Apprendi*'s "animating principle": the "preservation of the jury's historic role as a bulwark between the State and the accused at the trial for an alleged offense." *Ice*, 555 U. S., at 168. In stating *Apprendi*'s rule, we have never distinguished one form of punishment from another. Instead, our decisions broadly prohibit judicial factfinding that increases maximum criminal "sentence[s]," "penalties," or "punishment[s]"— terms that each undeniably embrace fines. *E.g., Blakely*, 542 U. S., at 304; *Apprendi*, 530 U. S., at 490; *Ring*, 536 U. S., at 589.

The Government objects, however, that fines are less

_____

punishment in some colonies, was not a central feature of criminal punishment until a later time." Preyer 329; see also Lillquist 641–643.

[2] In 2011, a fine was imposed on 9.0% of individual defendants and on 70.6% of organizational defendants in the federal system. See United States Sentencing Commission, 2011 Annual Report, ch. 5, pp. 34, 40.

[3] See, *e.g.,* 12 U. S. C. §1467a(i)(1); 15 U. S. C. §717t(b); 16 U. S. C. §825*o*(b); Cal. Health & Safety Code Ann. §25515(a) (West Supp. 2012); Colo. Rev. Stat. Ann. §§25–7–122.1(1)(b) and (c) (2011); Mass. Gen. Laws, ch. 21, §34C (West 2010); N. J. Stat. Ann. §13:1E–99.89(f) (West Supp. 2012).

[4] See, *e.g.,* 18 U. S. C. §3571(d) (fine "not more than the greater of twice the gross gain or twice the gross loss"); Fla. Stat. §775.083(1)(f) (2010) (same); Tex. Parks & Wild. Code Ann. §12.410(c) (West 2002) (same); see also 18 U. S. C. §645 (fine for embezzlement by officers of United States courts of up to twice the value of the money embezzled); §201(b) (fine for bribery of public officials of up to three times the value of the bribe).

onerous than incarceration and the death sentence. The Government notes that *Apprendi* itself referred to the physical deprivation of liberty that imprisonment occasions, see 530 U. S., at 484, and that we have placed more weight on imprisonment than on fines when construing the scope of the Sixth Amendment rights to counsel and jury trial. See *Blanton* v. *North Las Vegas*, 489 U. S. 538, 542–543 (1989) (jury trial); *Scott* v. *Illinois*, 440 U. S. 367, 373–374 (1979) (counsel). Therefore, the Government concludes, fines categorically "do not implicate" the "primary concerns motivating *Apprendi*." Brief for United States 23–25.

This argument fails because its conclusion does not follow from its premise. Where a fine is so insubstantial that the underlying offense is considered "petty," the Sixth Amendment right of jury trial is not triggered, and no *Apprendi* issue arises. See, *e.g., Muniz* v. *Hoffman*, 422 U. S. 454, 477 (1975) ($10,000 fine imposed on labor union does not entitle union to jury trial); see also *Blanton*, 489 U. S., at 541 (no jury trial right for "petty" offenses, as measured by the "severity of the maximum authorized penalty" (internal quotation marks omitted)). The same, of course, is true of offenses punishable by relatively brief terms of imprisonment—these, too, do not entitle a defendant to a jury trial. See *id.,* at 543 (establishing a rebuttable presumption that offenses punishable by six months' imprisonment or less are petty); *Duncan* v. *Louisiana*, 391 U. S. 145, 159–162 (1968).

But not all fines are insubstantial, and not all offenses punishable by fines are petty. See, *e.g., Mine Workers* v. *Bagwell*, 512 U. S. 821, 838, n. 5 (1994) (criminal contempt fine of $52 million imposed on union "unquestionably is a serious contempt sanction" that triggers right of jury trial). The federal twice-the-gain-or-loss statute, in particular, see 18 U. S. C. §3571(d), has been used to obtain substantial judgments against organizational defendants.

See, *e.g.,* Amended Judgment in *United States* v. *LG Display Co., Ltd.*, No. 08–CR–803–SI (ND Cal.), pp. 1–2 ($400 million fine for conviction of single count of violating Sherman Antitrust Act); Judgment in *United States* v. *Siemens Aktiengesellschaft*, No. 08–CR–367–RJL (D DC), pp. 1–2, 5 ($448.5 million fine for two violations of Foreign Corrupt Practices Act); United States Sentencing Commission, 2010 Annual Report, ch. 5, p. 38 (noting fine of $1.195 billion imposed on pharmaceutical corporation for violations of food and drug laws). And, where the defendant is an individual, a large fine may "engender 'a significant infringement of personal freedom.'" *Blanton*, 489 U. S., at 542 (quoting *Frank* v. *United States*, 395 U. S. 147, 151 (1969)); see also 18 U. S. C. §3572(a)(2) (requiring court to consider "the burden that the fine will impose upon the defendant" in determining whether to impose a fine and in what amount).

The Government thus asks the wrong question by comparing the severity of criminal fines to that of other punishments. So far as *Apprendi* is concerned, the relevant question is the significance of the fine from the perspective of the Sixth Amendment's jury trial guarantee. Where a fine is substantial enough to trigger that right, *Apprendi* applies in full. As we said in *Cunningham*, "Asking whether a defendant's basic jury-trial right is preserved, though some facts essential to punishment are reserved for determination by the judge, . . . is the *very* inquiry *Apprendi*'s 'bright-line rule' was designed to exclude." 549 U. S., at 291.

This case is exemplary. The RCRA subjects Southern Union to a maximum fine of $50,000 for each day of violation. 42 U. S. C. §6928(d). The Government does not deny that, in light of the seriousness of that punishment, the company was properly accorded a jury trial. And the Government now concedes the District Court made factual findings that increased both the "potential and actual" fine

the court imposed.  Brief for United States 28.  This is exactly what *Apprendi* guards against: judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow.

## B

In concluding that the rule of *Apprendi* does not apply to criminal fines, the Court of Appeals relied on our decision in *Ice.  Ice* addressed the question whether, when a defendant is convicted of multiple offenses, *Apprendi* forbids judges to determine facts that authorize the imposition of consecutive sentences.  555 U. S., at 164.  In holding that *Apprendi* does not, *Ice* emphasized that juries historically played no role in deciding whether sentences should run consecutively or concurrently.  See 555 U. S., at 168–169.  The Court of Appeals reasoned that juries were similarly uninvolved in setting criminal fines.  630 F. 3d, at 35.[5]

The Court of Appeals was correct to examine the historical record, because "the scope of the constitutional jury right must be informed by the historical role of the jury at common law."  *Ice*, 555 U. S., at 170.  See also, *e.g., Blakely*, 542 U. S., at 301–302; *Apprendi*, 530 U. S., at 477–484.  But in our view, the record supports applying

---

[5] *Ice* also stated in dicta that applying *Apprendi* to consecutive-versus-concurrent sentencing determinations might imperil a variety of sentencing decisions judges commonly make, including "the imposition of statutorily prescribed fines."  555 U. S., at 171.  The Court of Appeals read this statement to mean that *Apprendi* does not apply to criminal fines.  630 F. 3d, at 34.  We think the statement is at most ambiguous, and more likely refers to the routine practice of judges' imposing fines from within a range authorized by jury-found facts.  Such a practice poses no problem under *Apprendi* because the penalty does not exceed what the jury's verdict permits.  See 530 U. S., at 481.  In any event, our statement in *Ice* was unnecessary to the judgment and is not binding.  *Central Va. Community College* v. *Katz*, 546 U. S. 356, 363 (2006).

*Apprendi* to criminal fines. To be sure, judges in the colonies and during the founding era "possessed a great deal of discretion" in determining whether to impose a fine and in what amount. Lillquist 640–641; see also Preyer 350. Often, a fine's range "was apparently without limit except insofar as it was within the expectation on the part of the court that it would be paid." *Ibid.* For some other offenses, the maximum fine was capped by statute. See, *e.g., id.,* at 333 (robbery, larceny, burglary, and other offenses punishable in Massachusetts Bay Colony "by fines of up to £5"); Act of Feb. 28, 1803, ch. 9, §7, 2 Stat. 205 (any consul who gives a false certificate shall "forfeit and pay a fine not exceeding ten thousand dollars, at the discretion of the court"); K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) (describing federal practice).

The exercise of such sentencing discretion is fully consistent with *Apprendi*, which permits courts to impose "judgment *within the range* prescribed by statute." 530 U. S., at 481 (emphasis in original). Nor, *a fortiori*, could there be an *Apprendi* violation where no maximum is prescribed. Indeed, in surveying the historical record that formed the basis of our holding in *Apprendi*, we specifically considered the English practice with respect to fines, which, as was true of many colonial offenses, made sentencing largely "dependent upon judicial discretion." See *id.,* at 480, n. 7; see also *Jones* v. *United States*, 526 U. S. 227, 244–245 (1999); 4 W. Blackstone, Commentaries on the Laws of England 372–373 (1769) (hereinafter Blackstone). And even then, as the dissent acknowledges, *post,* at 11–12 (opinion of BREYER, J.), there is authority suggesting that English juries were required to find facts that determined the authorized pecuniary punishment. See 1 T. Starkie, A Treatise on Criminal Pleading 187–188 (1814) (In cases "where the offence, or its defined measure of punishment, depends upon" property's specific value,

the value "must be proved precisely as it is laid [in the indictment], and any variance will be fatal"); see also *id.,* at 188 ("[I]n the case of usury, where the judgment *depends upon the quantum taken*, the usurious contract must be averred according to the fact; and a variance from it, in evidence, would be fatal, because the penalty is apportioned to the value" (emphasis in original)); 2 W. Hawkins, A Treatise of the Pleas of the Crown, ch. 25, §75, pp. 234–235 (3d ed. 1739) (doubting whether "it be needful to set forth the Value of the Goods in an Indictment of Trespass for any other Purpose than to aggravate the Fine").

In any event, the salient question here is what role the jury played in prosecutions for offenses that did peg the amount of a fine to the determination of specified facts—often, the value of damaged or stolen property. See *Apprendi*, 530 U. S., at 502, n. 2 (THOMAS, J., concurring). Our review of state and federal decisions discloses that the predominant practice was for such facts to be alleged in the indictment and proved to the jury. See, *e.g., Commonwealth* v. *Smith*, 1 Mass. 245, 247 (1804) (declining to award judgment of treble damages for all stolen items in larceny prosecution when indictment alleged value of only some of the items); *Clark* v. *People*, 2 Ill. 117, 120–121 (1833) (arson indictment must allege value of destroyed building because statute imposed "a fine equal in value to the property burned"); *State* v. *Garner*, 8 Port. 447, 448 (Ala. 1839) (same in malicious mischief prosecution where punishment was fine "not exceeding four fold the value of the property injured or destroyed"); *Ritchey* v. *State*, 7 Blackf. 168, 169 (Ind. 1844) (same in arson prosecution because, "[i]n addition to imprisonment in the penitentiary, the guilty person is liable to a fine not exceeding double the value of the property destroyed"); *Hope* v. *Commonwealth*, 50 Mass. 134, 137 (1845) (the "value of the property alleged to be stolen must be set forth in the

indictment" in part because "[o]ur statutes . . . prescribe the punishment for larceny, with reference to the value of the property stolen"); *State* v. *Goodrich*, 46 N. H. 186, 188 (1865) ("It may also be suggested, that, in the case of simple larceny, the respondent may be sentenced to pay the owner of the goods stolen, treble the value thereof, which is an additional reason for requiring the [value of the stolen items] to be stated [in the indictment]"); *United States* v. *Woodruff*, 68 F. 536, 538 (Kan. 1895) ("[T]he defendant is entitled to his constitutional right of trial by jury" to ascertain "the exact sum for which a fine may be imposed").[6]

The rule that juries must determine facts that set a

_____

[6] The dissent believes these decisions are inapposite because some of them arose in States that authorized juries, rather than judges, to impose sentence. See *post,* at 18–20. But this fact was not the basis of the decisions; rather, the courts required value to be alleged and proved to the jury because "the extent of the punishment . . . depend[s] upon the value of the property consumed or injured." *Ritchey*, 7 Blackf., at 169; see also, *e.g., Clark*, 2 Ill., at 120–121 (same). And as Bishop explained, this requirement of proof originated not from a unique feature of jury sentencing, but from longstanding common-law principles—a point to which the dissent notably does not respond. 1 J. Bishop, Criminal Procedure §§81, 540 (2d ed. 1872). See *infra,* at 12.

Nor, for that matter, do larceny cases "presen[t] a special circumstance." *Post,* at 20. Such decisions invoked the same reasoning as the other cases just mentioned. See, *e.g., Hope*, 50 Mass., at 137 (value must be proved because, among other things, "[o]ur statutes . . . prescribe the punishment for larceny . . . with reference to the value of the property stolen"); *Goodrich*, 46 N. H., at 188 (same). Bishop made this point explicit: "[Value] must be alleged wherever it is an element to be considered by the court in determining the punishment, *and it is immaterial whether the particular crime is larceny or any other crime.*" Criminal Procedure §541, at 331 (footnote omitted and emphasis added). At the end of the day, the only evidence the dissent musters that judges found fine-enhancing facts are *United States* v. *Tyler*, 7 Cranch 285 (1812), and one lower-court decision restating *Tyler*'s holding. See *post,* at 15–17. We address *Tyler* below. See *infra,* at 13–14.

fine's maximum amount is an application of the "two longstanding tenets of common-law criminal jurisprudence" on which *Apprendi* is based: First, "the 'truth of every accusation' against a defendant 'should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours.'" *Blakely*, 542 U. S., at 301 (quoting 4 Blackstone 343). And second, "'an accusation which lacks any particular fact which the law makes essential to the punishment is . . . no accusation within the requirements of the common law, and it is no accusation in reason.'" 542 U. S., at 301–302 (quoting 1 J. Bishop, Criminal Procedure §87, p. 55 (2d ed. 1872)). Indeed, Bishop's leading treatise on criminal procedure specifically identified cases involving fines as evidence of the proposition that "the indictment must, in order to inform the court what punishment to inflict, contain an averment of every particular thing which enters into the punishment." *Id.,* §540, at 330 (discussing *Clark* and *Garner*). This principle, Bishop explained, "pervades the entire system of the adjudged law of criminal procedure. It is not made apparent to our understandings by a single case only, but by all the cases." Criminal Procedure §81, at 51. See also *Apprendi*, 530 U. S., at 510–511 (THOMAS, J., concurring) (explaining that Bishop grounded this principle in "well-established common-law practice . . . and in the provisions of Federal and State Constitutions guaranteeing notice of an accusation in all criminal cases, indictment by a grand jury for serious crimes, and trial by jury").

As counterevidence that juries historically did not determine facts relevant to criminal fines, the Government points to two decisions from this Court. One is *United States* v. *Murphy*, 16 Pet. 203 (1842), which considered whether an interested witness was competent to testify in a larceny prosecution brought under a provision of the Crimes Act of 1790. *Murphy*'s only relevance to this case is that the Crimes Act authorized a fine of up to four times

the value of the stolen property, and the Court remarked that "the fine is, as to its amount, purely in the discretion of the Court." *Id.,* at 209. But this statement is best read as permitting the court to select a fine from within the maximum authorized by jury-found facts—a practice, as noted, that accords with *Apprendi.* Such a reading is consistent with the fact that the indictment in *Murphy* alleged the value of the stolen items, see 16 Pet*.,* at 207–208, and with the practice of contemporary courts addressing the same statute, see *United States* v. *Holland*, 26 F. Cas. 343, 345 (No. 15,378) (CC SDNY 1843) (trial court instructs jury "to assess the value of the property taken" in order to determine maximum fine); *Pye* v. *United States*, 20 F. Cas. 99 (No. 11,488) (CC DC 1842) (value of stolen items alleged in indictment).

The Government and dissent place greater reliance on *United States* v. *Tyler*, 7 Cranch 285 (1812). But like *Murphy*, this decision involved no constitutional question. Rather, it construed a federal embargo statute that imposed a fine of four times the value of the property intended to be exported. The indictment identified the property at issue as "*pearl-ashes*," but the jury's guilty verdict referred instead to "'*pot-ashes* [that] were worth two hundred and eighty dollars.'" *Tyler*, 7 Cranch, at 285.[7] The question was whether the discrepancy rendered the verdict "not sufficiently certain as to the value of the property charged in the indictment," *i.e.,* pearl-ashes. *Ibid.* The Court held that the discrepancy was immaterial, on the ground that "under this law, no valuation by the jury was

——————

[7] We will not keep the reader in suspense: pot-ash and pearl-ash are alkaline salts of differing causticity that "for a long time . . . [were] amongst the most valuable articles of manufacture and commerce" in parts of early America. D. Townsend, Principles and Observations Applied to the Manufacture and Inspection of Pot and Pearl Ashes 3 (1793). See also *Board of Trustees of Leland Stanford Junior Univ.* v. *Roche Molecular Systems, Inc.*, 563 U. S. __, __ (2011) (slip op., at 6).

necessary to enable the Circuit Court to impose the proper fine." *Ibid.* The Court's reasoning is somewhat opaque, but appears to rest on the text of the embargo statute, which directed that the defendant "shall, upon conviction, be . . . fined a sum by the Court." *Ibid.* In any event, nothing in the decision purports to construe the Sixth Amendment. And, insofar as *Tyler* reflects prevailing practice, it bears noting that both the indictment and verdict identified the value of the property at issue. See Tr. 2 in *Tyler*, 7 Cranch 285, reprinted in Appellate Case Files of the Supreme Court of the United States, 1792–1831, National Archives Microfilm Publications No. 214 (1962), roll 18 (indictment: "nineteen barrels of pearlashes, which were then and there of the value of six hundred dollars"). Whatever the precise meaning of this decision, it does not outweigh the ample historical evidence showing that juries routinely found facts that set the maximum amounts of fines.

## III

The Government's remaining arguments, echoed by the dissent (see *post,* at 23–28), are unpersuasive. The Government first submits that, when it comes to fines, "the judicially found facts typically involve only quantifying the harm caused by the defendant's offense"—for example, *how long* did the violation last, or *how much money* did the defendant gain (or the victim lose)?—"as opposed to defining a separate set of acts for punishment." Brief for United States 25. Only the latter determination, the Government contends, implicates *Apprendi*'s concerns.

This argument has two defects. First, it rests on an assumption that *Apprendi* and its progeny have uniformly rejected: that in determining the maximum punishment for an offense, there is a constitutionally significant difference between a fact that is an "element" of the offense and one that is a "sentencing factor." See, *e.g.,* 530 U. S., at

478; *Ring*, 536 U. S., at 605. Second, we doubt the coherence of this distinction. This case proves the point. Under 42 U. S. C. §6928(d), the fact that will ultimately determine the maximum fine Southern Union faces is the number of days the company violated the statute. Such a finding is not fairly characterized as merely "quantifying the harm" Southern Union caused. Rather, it is a determination that for each given day, the Government has proved that Southern Union committed all of the acts constituting the offense.

The Government next contends that applying *Apprendi* to fines will prevent States and the Federal Government from enacting statutes that, like §6928(d), calibrate fines to a defendant's culpability, thus providing just punishment and reducing unwarranted sentencing disparity. But the Government presents a false choice. As was true in our prior *Apprendi* cases, and remains so here, legislatures are free to enact statutes that constrain judges' discretion in sentencing—*Apprendi* requires only that such provisions be administered in conformance with the Sixth Amendment.

Last, the Government argues that requiring juries to determine facts related to fines will cause confusion (because expert testimony might be needed to guide the inquiry); or prejudice the defendant (who might have to deny violating a statute while simultaneously arguing that any violation was minimal); or be impractical (at least when the relevant facts are unknown or unknowable until the trial is completed).[8] These arguments rehearse

_____

[8] In this vein, the dissent speculates that today's decision may "nudg[e] our [criminal justice] system" further in favor of plea bargains at the expense of jury trials. *Post,* at 28. But groups representing the interests of defendants—whom the dissent's rule purportedly favors— tell us the opposite is true. See Brief for Chamber of Commerce of the United States of America et al. as *Amici Curiae* 5 ("[E]xempting criminal fines from *Apprendi* makes innocent defendants more likely to

those made by the dissents in our prior *Apprendi* cases. See *Booker*, 543 U. S., at 329 (BREYER, J., dissenting in part); *Blakely*, 542 U. S., at 318–320 (O'Connor, J., dissenting); *id.,* at 330–340 (BREYER, J., dissenting); *Apprendi*, 530 U. S., at 555–559 (same). Here, as there, they must be rejected. For even if these predictions are accurate, the rule the Government espouses is unconstitutional. That "should be the end of the matter." *Blakely*, 542 U. S., at 313.

But here there is particular reason to doubt the strength of these policy concerns. *Apprendi* is now more than a decade old. The reliance interests that underlie many of the Government's arguments are by this point attenuated. Nor, in our view, does applying *Apprendi*'s rule to criminal fines mark an unexpected extension of the doctrine. Most Circuits to have addressed the issue already embrace this position, see *Pfaff*, 619 F. 3d, at 175–176; *LaGrou Distribution Sys.*, 466 F. 3d, at 594; *United States* v. *Yang*, 144 Fed. Appx. 521, 524 (CA6 2005), as did the Government prior to *Ice*, see Brief in Opposition 11, n. 2. In light of the reasons given in this opinion, the dramatic departure from precedent would be to hold criminal fines exempt from *Apprendi*.

*         *         *

We hold that the rule of *Apprendi* applies to the imposition of criminal fines. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

───────────

plead guilty").

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–94

_____

## SOUTHERN UNION COMPANY, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[June 21, 2012]

JUSTICE BREYER, with whom JUSTICE KENNEDY and JUSTICE ALITO join, dissenting.

Where a criminal fine is at issue, I believe the Sixth Amendment permits a sentencing judge to determine sentencing facts—facts that are not elements of the crime but are relevant only to the amount of the fine the judge will impose. Those who framed the Bill of Rights understood that "the finding of a particular fact" of this kind was ordinarily a matter for a judge and not necessarily "within 'the domain of the jury.'" *Oregon* v. *Ice*, 555 U. S. 160, 168 (2009) (quoting *Harris* v. *United States*, 536 U. S. 545, 557 (2002) (plurality opinion)). The Court's contrary conclusion, I believe, is ahistorical and will lead to increased problems of unfairness in the administration of our criminal justice system.

I

Although this dissent does not depend upon the dissents in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), and its progeny, summarizing those earlier dissents will help the reader understand this one. See *id.,* at 523–554 (O'Connor, J., dissenting); *id.,* at 555–556 (BREYER, J., dissenting); see also *United States* v. *Booker*, 543 U. S. 220, 327 (2005) (BREYER, J., dissenting in part) (citing cases); *Blakely* v. *Washington*, 542 U. S. 296, 329 (2004)

(BREYER, J., dissenting) (same).  The *Apprendi* dissenters argued that the law had long distinguished between (1) facts that constitute elements of the offense and (2) facts relevant only to sentencing.  The term "elements of the offense" means "constituent parts of a crime . . . that the prosecution must prove to sustain a conviction."  Black's Law Dictionary 597 (9th ed. 2009).  The statute that creates the crime in question typically sets forth those constituent parts.  And a jury must find the existence of each such element "beyond a reasonable doubt."  See, *e.g., United States* v. *Gaudin*, 515 U. S. 506, 510 (1995); *In re Winship*, 397 U. S. 358, 364 (1970).

Thus, a bank robbery statute might prohibit an offender from (1) taking by force or by intimidation (2) in the presence of another person (3) a thing of value (4) belonging to, or in custody of, a bank.  In that case, the jury can convict only if it finds the existence of each of these four factual "elements" beyond a reasonable doubt.  But it need not find other facts beyond a reasonable doubt, for these four factual elements alone constitute the crime.

Other facts may be relevant to the length or kind of sentence the court will impose upon a convicted offender.  These sentencing facts typically characterize the manner in which the offender carried out the crime or set forth relevant features characterizing the offender.  For example, in respect to manner, an offender might have carried out a particular bank robbery

> "with (or without) a gun, which the robber kept hidden (or brandished), might have frightened (or merely warned), injured seriously (or less seriously), tied up (or simply pushed) a guard, teller, or customer, at night (or at noon), in an effort to obtain money for other crimes (or for other purposes), in the company of a few (or many) other robbers . . . ."  United States Sentencing Commission, Guidelines Manual §1A1.3,

p. 3 (Nov. 2011) (USSG).

In respect to characteristics of the offender, a current bank robbery conviction might be that offender's first (or his fourth) criminal conviction.

Traditionally, sentencing facts help the sentencing judge determine where, within say a broad statutory range of, say, up to 20 years of imprisonment, the particular bank robber's punishment should lie. The *Apprendi* dissenters concluded that the Constitution did not require the jury to find the existence of those facts beyond a reasonable doubt. Rather the law, through its rules, statutes, and the Constitution's Due Process Clause would typically offer the defendant factfinding protection. See, *e.g.,* Fed. Rule Crim. Proc. 32 (federal presentence report prepared by probation office sets forth facts, which defendant may contest at sentencing proceeding); *Almendarez-Torres* v. *United States*, 523 U. S. 224, 239–247 (1998) (constitutional inquiry).

The dispute in *Apprendi* and its line of cases arose after Congress and many States codified these sentencing facts during the sentencing reform movement of the 1970's and 1980's. Congress, for example, concluded that too many different judges were imposing too many different sentences upon too many similar offenders who had committed similar crimes in similar ways. It subsequently enacted the Sentencing Reform Act of 1984, creating a federal Sentencing Commission which would produce greater uniformity in sentencing through the promulgation of mandatory uniform Guidelines structuring how judges, in ordinary cases, should typically use sentencing facts to determine sentences. 28 U. S. C. §§991, 994 (2006 ed. and Supp. IV); see also 18 U. S. C. §§3553(b)(1), 3742(e). The *Apprendi*-line majority agreed that, where a statute set a higher maximum sentence, a Commission might structure how a judge found sentencing facts relevant to the sen-

tence imposed below that otherwise applicable maximum, at least if the resulting guidelines were not mandatory. See *Booker*, 543 U. S., at 245. But the majority held that where a sentencing fact increased the otherwise applicable maximum penalty, that fact had to be found by a jury. *Apprendi*, 530 U. S., at 490.

As I have said, the dissenters thought that the Sixth Amendment did not require a jury to find any of these sentencing facts. Why, asked the dissenters, should Congress' or a State's desire for greater sentencing uniformity achieved through statutes seeking more uniform treatment (of similar offenders committing similar offenses in similar ways) suddenly produce new Sixth Amendment jury trial requirements?

Those requirements would work against greater sentencing fairness. To treat all sentencing facts (where so specified in a statute or rule) as if they were elements of the offense could lead Congress simply to set high maximum ranges for each crime, thereby avoiding *Apprendi*'s jury trial requirement. Alternatively, Congress might enact statutes that more specifically tied particular punishments to each crime (limiting or removing judicial discretion), for example, mandatory minimum statutes. But this system would threaten disproportionality by insisting that similar punishments be applied to very different kinds of offense behavior or offenders. *Apprendi*'s jury trial requirements might also prove unworkable. Consider the difficulty of juries' having to find the different facts in the bank robbery example I have set forth above. Moreover, how is a defendant, arguing that he did not have a gun, alternatively to argue that, in any event, he did not fire the gun?

Finally, the dissenters took a different view of Sixth Amendment history. They believed that under the common law and at the time the Constitution was ratified, judges, not juries, often found sentencing facts, *i.e.,* facts

relevant only to the determination of the offender's punishment. See, *e.g., Booker*, *supra*, at 329 (BREYER, J., dissenting in part); *Apprendi*, 530 U. S., at 527–529 (O'Connor, J., dissenting).

The dissenters lost the argument. The Court in *Apprendi* held that (other than the fact of a prior conviction) "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.,* at 490. But the dissenters' views help to explain why I continue to believe this Court should not extend *Apprendi*'s rule beyond "'the central sphere of [its] concern.'" *Ice,* 555 U. S., at 172 (quoting *Cunningham* v. *California*, 549 U. S. 270, 295 (2007) (KENNEDY, J., dissenting)). That is the Court's view, too, as set forth in *Ice*. And I base my dissent here primarily upon *Ice*.

## II

This case involves sentencing facts, not elements of a crime. The criminal statute at issue constitutes one part of the Resource Conservation and Recovery Act of 1976 (RCRA), which, among others things, authorizes the Environmental Protection Agency to create a list of hazardous wastes. 42 U. S. C. §6921. The criminal statute says:

> "Any person who . . . knowingly treats, stores, or disposes of any hazardous waste identified or listed under [RCRA] . . . without [an RCRA-authorized] permit . . . shall, upon conviction, be subject to a fine of not more than $50,000 for each day of violation, or imprisonment not to exceed . . . five years . . . , or both." §6928(d)(2)(A).

No one here denies that this statute creates a crime with four elements: (1) knowing treatment, storage, or disposal of a waste (2) that is hazardous, (3) without a permit, and (4) knowing that the waste has a substantial potential of

causing harm to others or to the environment. App. 129–
130; see Brief for Petitioner 30.

The number of "day[s] of each violation," however, is not
an additional element of the crime. The statute says that
the number of days becomes relevant only "upon convic-
tion" of the crime as previously defined. Moreover, the
number of days is relevant to application of only one of
two kinds of punishment that the statute mentions (fine
and imprisonment); one cannot easily read this statute as
creating two separate crimes identical but for the punish-
ment. Finally, Congress did not include here, as it some-
times has done, statutory words such as "each day of
violation shall constitute a separate offense." *E.g.,* 47
U. S. C. §223(b); see also 42 U. S. C. §4910(b). Rather, as
in many other similar statutes, the statute here sets forth
the crime and kinds of punishments (fine and imprison-
ment), while separately specifying facts that determine
the maximum punishment of one kind (fines).

In this particular case, the indictment set forth a viola-
tion period of 762 days (from "on or about September 19,
2002 until on or about October 19, 2004"). App. 104. The
jury's guilty verdict did not specify the number of days on
which the defendant committed the offense. *Id.,* at 141.
But after the conviction and sentencing hearing, the judge
found that, among other things, the "clear and essentially
irrefutable evidence" at trial supported the conclusion set
forth in the presentence report, namely, that the maxi-
mum fine available amounted to $50,000 per day for 762
days—or $38.1 million. App. to Pet. for Cert. 47a–48a.
The judge imposed a fine of $6 million along with a $12
million community service obligation. App. 162–163.

### III

*Apprendi* says that "any fact that increases the penalty
for a crime beyond the prescribed statutory maximum
must be submitted to a jury, and proved beyond a reason-

able doubt." 530 U. S., at 490. The number of days (be-
yond one) on which the defendant violated this criminal
statute is such a fact. Nonetheless, like the majority, I
believe that *Apprendi*'s rule does not automatically control
the outcome in this case.

That is because this case concerns a fine, not, as in
*Apprendi,* a term of imprisonment. And we made clear in
*Oregon* v. *Ice*, 555 U. S. 160, that *Apprendi* does not en-
compass every kind of fact-related sentencing decision
that increases the statutory maximum. In *Ice*, we consid-
ered *Apprendi*'s application to a sentencing decision about
whether two prison sentences for conviction of two sepa-
rate crimes (*e.g.,* illegal drug possession and illegal gun
possession) would run concurrently or consecutively. 555
U. S., at 163. An Oregon statute required a concurrent
sentence unless the sentencing judge found certain facts.
*Id.,* at 165. Those facts could make a large difference in a
term of imprisonment. Their presence could mean that a
5-year sentence for illegal drug possession and a 5-year
sentence for illegal gun possession would amount to 10
years of imprisonment rather than 5 (indeed, in *Ice* itself,
the judge's factfinding increased the sentence by 20 years,
see *id.,* at 166, and n. 5). Thus, the presence of those
"fact[s]" could "increas[e] the penalty" beyond what would
otherwise be "the prescribed statutory maximum." *Id.,* at
167 (internal quotation marks omitted). Nonetheless, we
held that the Sixth Amendment permitted a judge—it did
not require a jury—to make that factual determination.
*Id.,* at 164.

We consequently concluded that *Apprendi* does not
encompass every kind of fact-related sentencing decision
that increases the statutory maximum. In doing so, we
wrote that the "animating principle" of *Apprendi*'s rule
"is the preservation of the jury's historic role as a bul-
wark between the State and the accused at the trial for
an alleged offense." 555 U. S., at 168. And we refused

to extend *Apprendi*'s rule to a new category of sentence-related facts for two basic reasons.

First, we considered a historical question, namely, whether "the finding of a particular fact was understood as within 'the domain of the jury . . . by those who framed the Bill of Rights.'" 555 U. S., at 168 (quoting *Harris*, 536 U. S., at 557). And we read the "historical record" as showing that "in England before the founding of our Nation, and in the early American States," the jury "played no role in the decision to impose sentences consecutively or concurrently." 555 U. S., at 168–169 (footnote omitted). Rather, that decision "rested exclusively with the judge." *Id.,* at 168.

Second, recognizing that "administration of a discrete criminal justice system is among the [States'] basic sovereign prerogatives," we considered the need to "respect . . . state sovereignty." *Ibid.* We expressed concern lest application of *Apprendi* to this kind of decision inhibit state legislative efforts to establish a fairer sentencing system by helping to bring about more uniform sentencing. *Ice*, 555 U. S., at 171. We concluded that "[n]either *Apprendi* nor our Sixth Amendment traditions compel straitjacketing the States" in this respect. *Ibid.*

This case presents another new category of fact-related sentencing decisions, namely, decisions about the amount of a fine. Thus, as the majority recognizes, we must begin with a historical question. *Ante,* at 8. Who—judge or jury—found the facts that determine the amount of a criminal fine "in England before the founding of our Nation, and in the early American States?" *Ice, supra*, at 169 (footnote omitted). Unlike the majority, I believe the answer to this question is that, in most instances, the judge made that determination.

## IV
## A

*Apprendi* relied heavily upon the fact that in "England before the founding of our Nation" the prescribed punishment for more serious crimes, *i.e.,* felonies, was typically fixed—indeed, fixed at death. 530 U. S., at 478–480; see J. Baker, An Introduction to English Legal History 512 (4th ed. 2007); J. Beattie, Crime and the Courts in England, 1660–1800, pp. 409, 450–451 (1986) (hereinafter Beattie); Langbein, The English Criminal Trial on the Eve of the French Revolution, in The Trial Jury in England, France, Germany 1700–1900, pp. 13, 16, 36–37 (A. Schioppa ed. 1987). The facts related to the application of that punishment were typically elements of the crime. And the jury, not the judge, determined the existence of those facts. See 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone); see also Baker, *supra,* at 512–518 (in practice, the jury or judge could ameliorate capital punishment through application of doctrines such as "pious perjury," "benefit of clergy," and reprieves, or the King could grant a royal pardon); Beattie 419–435 (same).

Punishment for lesser crimes, however, included fines. And under the common law, the judge, not the jury, determined the amount of the fine and the sentencing facts relevant to the setting of that amount. See Baker, *supra,* at 512; Beattie 459. Pertinent sentencing facts typically concerned the *manner* in which the offender committed the crime and the characteristics of that offender. See *id.,* at 456–460. Thus, in 1769, Blackstone wrote:

> "Our statute law has not therefore often ascertained the quantity of fines, *nor the common law ever*; it directing such an offense to be punished by fine, in general, without specifying the certain sum." Blackstone 372 (emphasis added).

That is because

> "the *quantum,* in particular, of pecuniary fines neither
> can, nor ought to be, ascertained by any invariable
> law.  The value of money itself changes from a thou-
> sand causes; and, at all events, what is ruin to one
> man's fortune, may be a matter of indifference to an-
> other."  *Id.,* at 371.

Moreover, the "quantum" of pecuniary fines

> "must frequently vary, from aggravations or otherwise
> of the offense [*i.e.,* the *manner* in which the crime was
> committed], the quality and conditions of the parties
> *[e.g.,* the *offender's characteristics]*, and from innu-
> merable other circumstances."  *Ibid.*

Similarly, the 18th-century statesman and treatise-
writer Baron Auckland pointed out that in 10th-century
England pre-Norman law had attached a fixed financial
penalty to each specific crime.  Principles of Penal Law 69
(2d ed. 1771).  That law, for example, imposed a penalty of
3 cows for perjury and 12 cows for the rape of a maid.
*Ibid.*  This system, Baron Auckland added, ignored varia-
tions in, for example, the differing value of a fixed fine, say
a cow, over time and among individuals; it also ignored
the manner in which the offense was committed and the
characteristics of the offender.  *Id.,* at 69–72.  For those
reasons, 18th-century English law ordinarily left "the
quantum of the fine" to "the discretion of the Judges."  *Id.,*
at 68 (emphasis deleted).

> "[Because t]he enormity and tendency of the crime,
> the malice and wilfulness of the intention, the incon-
> siderateness and suddenness of the act, the age, facul-
> ties, and fortune of the offender, form a chain of
> complex questions; which can be resolved only by
> *the evidence of each separate charge*, and for which no
> human foresight can provide . . . then arises a neces-

sary appeal *to the breast of the judge.*" *Id.,* at 72 (emphasis added).

The only generally applicable limitations on the judge, when imposing the fine, were those contained in the English Bill of Rights and the Magna Carta. 1 W. & M., ch. 2, §11, in 3 Eng. Stat. at Large 440 (forbidding "excessive Fines"); Magna Carta §20, 9 Hen. III, §14, in 1 Eng. Stat. at Large 5 (1225) (fine cannot deprive offender of means of livelihood); see Auckland, *supra,* at 73 (so interpreting Magna Carta); Blackstone 372–373 (same).

To be sure, the jury, not the judge, would determine the facts that made up the elements of the crime, even though those elements might be relevant to whether a fine could apply and, if so, the amount of the fine imposed as well. The common law, for example, defined larceny as the theft of goods that had some intrinsic value and divided the offense into grand larceny, which was theft of goods valued at more than a shilling, and petit larceny, which was theft of goods worth less than a shilling. Blackstone 229–234; Langbein, *supra,* at 16–17; see also Beattie 424 (whether "benefit of clergy" was available depended on value stolen). Consequently, the jury would determine the value of the goods in question. In doing so, the jury might "manipulate the sentence by valuing the goods at under a shilling and thereby spare the defendant the capital sanction." Lillquist, The Puzzling Return of Jury Sentencing: Misgivings About *Apprendi*, 82 N. C. L. Rev. 621, 636 (2004). But otherwise "the jury could not influence what other penalties" like fines the defendant might face because in "non-capital criminal cases" the amount of punishment "was left solely in the hands of the justices." *Ibid.*

I cannot determine with any certainty the extent to which 18th-century law placed other relevant limitations upon the judges' authority to determine fine-related sentencing facts. I have found an 1814 English treatise on

criminal pleading that says, unlike in cases "where to constitute the offence the value must [only] be of a certain amount," in cases "where the offence, or its defined measure of punishment, depends upon the quantity of that excess . . . a variance from the amount averred . . . will be fatal." 1 T. Starkie, A Treatise on Criminal Pleading 187–188 (emphasis deleted). It then adds that "in the case of usury, where the judgment *depends upon the quantum taken*, the usurious contract must be averred according to the fact; and a variance from it, in evidence, would be fatal, because the penalty is apportioned to the value." *Id.,* at 188. And an 18th-century treatise says that it is questionable whether it is necessary "to set forth the Value of the Goods in an Indictment of Trespass *for any other Purpose than to aggravate the Fine*." 2 W. Hawkins, A Treatise of the Pleas of the Crown, ch. 25, §75, pp. 234–235 (3d ed. 1739) (emphasis added). One *might* read these statements as supporting the majority, for they *might* indicate that, where a statute sets forth facts that determine a pecuniary penalty, then a jury, not judge, would determine those facts.

But whether that is the correct reading is unclear. For one thing, prosecutions for economic crimes were usually brought by injured parties and the "fine" in such cases went in whole or in part to compensate that party for damages. See Beattie 35–36, 192. For example, immediately following the sentence I have just quoted, Hawkins wrote that it is questionable whether it is necessary "to set forth the Value of the Goods . . . in an Indictment of Larceny for any other Purpose than to sh[o]w that the Crime amounts to grand Larceny, and to ascertain the Goods, thereby the better to [e]ntitle *the Prosecutor* to a *Restitution*." Hawkins, *supra,* at 234–235 (emphasis added; footnote omitted). Likewise, Blackstone dated English usury law back to a 1545 statute that provided as the penalty that the offending lender shall both "make f[i]ne

. . . at the King's will and pleasure" and forfeit "treble value" of the money borrowed—with half to the King and the other half "*to him or them that will sue for the same.*" 37 Hen. VIII, ch. 9, in 3 Stat. of Realm 997 (emphasis added); see Blackstone 156; see also M. Ord, An Essay on the Law of Usury 122–123 (3d ed. 1809) (treble-value forfeitures recovered through information *qui tam* but discretionary fines recovered through criminal indictment). Thus, the statutes at issue were what American courts would later call quasi-civil statutes—part civil, part criminal; see also Beattie 457.

Parliament consequently would have had a special reason for requiring jury determinations of the amount of the pecuniary penalty. And Parliament had the authority to depart from the common law and to insist that juries determine sentencing facts without establishing a generally applicable principle. The relevant question here is how often and for what purposes Parliament did so. Blackstone himself wrote that such statutes fixing fines in amounts were both in derogation of the common law and uncommon. Blackstone 372. Finally, no one here argues that we adopt the rule actually suggested by the treatises. That rule is not that sentencing is to be done according to value found by the jury but instead that a discrepancy between the value alleged and value found by the jury might render the entire case fatal. See Starkie, *supra,* at 188.

Thus, I cannot place great weight upon these statutes. The parties did not refer to them in their briefs. And in any event, the historical sources taken together make clear that the predominant practice in 18th-century England was for a judge, not a jury, to find sentencing facts related to the imposition of a fine.

Indeed, the Court in *Apprendi* conceded the point. It distinguished 18th-century punishments for greater crimes (fixed punishments) from punishments for lesser

crimes (included fines). 530 U. S., at 480, n. 7. And it wrote that "judges most commonly imposed *discretionary* 'sentences' of fines . . . upon misdemeanants." *Ibid.* (emphasis added). Insofar as 18th-century English practice helps determine what the Framers would have thought about the scope of the Constitution's terms—here, the Sixth Amendment's right to trial by an impartial jury— that practice suggests they would *not* have expected that right to include determination of sentencing facts relevant only to the imposition of a fine.

### B

Practice in the "early American States" is even less ambiguous. In the colonial era, judges would normally determine the amount of a fine (within an unlimited or otherwise broad range) while also determining related sentencing facts (say, about the manner in which the offender committed the crime and the offender's characteristics). Legal historians tell us that in the American colonies a criminal fine was "overwhelmingly the most common of the non-capital punishments," that in most instances the range of the fine was "apparently without limit except insofar as it was within the expectation of the court that it would be paid," that the judge established the precise amount of the fine, and that the amount was "tailored individually to the particular case." Preyer, Penal Measures in the American Colonies: An Overview, 26 Am. J. Legal Hist. 326, 350 (1982). "[C]olonial judges, like their English brethren, possessed a great deal of discretion" and could set the amount of fine "depending upon the nature of the defendant and the crime." Lillquist, 82 N. C. L. Rev., at 640–641.

Enactment of the Constitution and Bill of Rights did not change this practice. Some early American statutes specified that the judge has discretion to set the amount of the fine while saying nothing about amount. *E.g.,* Crimes Act

of 1790, ch. 9, §21, 1 Stat. 117 (any person who bribes a judge "on conviction thereof shall be fined and imprisoned at the discretion of the court"); §28, 1 Stat. 118 (any person who does violence to an ambassador or public minister, "on conviction, shall be imprisoned not exceeding three years, and fined at the discretion of the court"). Others set only a maximum limitation. *E.g.,* Act of Mar. 3, 1791, ch. 15, §39, 1 Stat. 208 (officer of inspection convicted of oppression or extortion "shall be fined not exceeding five hundred dollars, or imprisoned not exceeding six months, or both, at the discretion of the court"). In respect to these statutes, Justice Iredell wrote in 1795 that the "common law practice . . . must be adhered to; that is to say, the jury are to find whether the prisoner be guilty, and . . . the court must assess the fine." *United States* v. *Mundell*, 27 F. Cas. 23, 24 (No. 15,834) (CC Va.).

Still other statutes, as in England, specifically keyed the amount of the fine to a specific factual finding. A section of the Crimes Act of 1790, for example, said that any person who upon United States property or the high seas "shall take and carry away, with an intent to steal or purloin the personal goods of another . . . shall, on conviction, be fined not exceeding the fourfold value of the property so stolen." §16, 1 Stat. 116. This crime has several elements: (1) taking and (2) carrying away (3) with intent to steal (4) personal goods (5) belonging to another (6) on United States property or the high seas. The jury must find the existence of these facts beyond a reasonable doubt to establish a conviction. But the statute also says that the fine cannot exceed "the fourfold value of the property so stolen." And it thereby requires the finding of a sentencing fact, namely the value of the stolen property. Who would make this determination—judge or jury?

Unlike in 18th-century England, in the United States there is case law directly answering the question. In *United States* v. *Tyler*, 7 Cranch 285 (1812), this Court

considered a federal embargo statute making it a crime to
"put" certain "goods" on board a ship with intent to "ex-
port" them outside of the United States. See Act of Jan. 9,
1809, ch. 5, §1, 2 Stat. 506. The statute also provided
that an offender's "goods" and ship "shall be forfeited," and
the offender, "shall, upon conviction," be "fined a sum, by
the court before which the conviction is had, equal to four
times the value of such specie, goods, wares and merchan-
dise." *Ibid.* The statute thereby required determination of
a sentencing fact, namely "the value of such . . . goods."
Was the finding of this sentencing fact for the judge or for
the jury?

In *Tyler,* the defendant had been indicted for attempting
to export 19 barrels of pearl-ashes, valued at $600. *Ante,*
at 13–14. The jury convicted the defendant, but when
doing so, it said that it found the defendant guilty of hav-
ing tried to export "'pot-ashes . . . worth two hundred and
eighty dollars.'" 7 Cranch, at 285 (emphasis deleted). The
defendant appealed, claiming a difference between the
jury's basis for conviction and the crime as charged in the
indictment. The difference between the words "pearl-
ashes" and "pot-ashes" is unlikely to have mattered, for
pearl-ash is simply a refined grade of pot-ash (potassium
carbonate). See T. Barker, R. Dickinson, & D. Hardie,
Origins of the Synthetic Alkali Industry in Britain, 23
Economica 158, 163 (1956). Thus, the defendant did not
focus upon that difference. Rather, he claimed that the
jury's verdict "was not sufficiently certain as to the *value*
of the property charged in the indictment." *Tyler*, 7
Cranch, at 285 (emphasis added). Because $280 differs
from $600, the jury had not found him guilty of the crime
charged.

The Supreme Court, however, found that the jury's
finding as to valuation was not *relevant.* It upheld the
conviction because it was "of the opinion that, under this
law, *no valuation by the jury was necessary to enable the*

*Circuit Court to impose the proper fine." Ibid.* (emphasis added). The Court did not say explicitly that the Sixth Amendment permitted the judge to find the relevant sentencing fact. See *ante,* at 14. But it seems unlikely that a Court that included Chief Justice John Marshall, Justice Joseph Story, and others familiar with both the common law and the Constitution would have interpreted a federal statute as they did if *either* contemporary legal practice *or* the Constitution suggested or required a different interpretation.

Nor can we say that the Court did not fully consider the matter. Justice Story later authoritatively interpreted *Tyler.* Sitting as a Circuit Justice in *United States* v. *Mann,* 26 F. Cas. 1153 (No. 15,717) (CCNH 1812), he considered the same judge/jury question in respect to the same embargo statute. His court wrote that in "*Tyler*, 7 Cranch 285, in a prosecution on this same clause, *the court held that the fine and quadruple value must be assessed and adjudged by the court*, and not by the jury." *Id.,* at 1153 (emphasis added); see also 26 F. Cas. 1153, 1155 (No. 15,718) (CCNH 1812) (Story, J.) (noting that the Supreme Court would not have reached its result unless satisfied "that the fine was to be imposed by the court, and not found by the jury").

Thus, nothing in early American practice suggests that the Framers thought that the Sixth Amendment jury trial right encompassed a right to have a jury determine fine-related sentencing facts. But, to the contrary, there is a Supreme Court opinion, namely *Tyler,* that holds, or at least strongly indicates, the opposite.

## C

The majority reaches a different conclusion. But the majority does not pose what I believe to be the relevant historical question, namely whether traditionally "in England before the founding of our Nation, and in the

early American States," see *Ice*, 555 U. S., at 169 (footnote omitted), judges, not juries, normally determined fine-related sentencing facts.  Instead, it asks whether a jury, rather than the judge, found those facts in that subclass of cases where a statute "peg[ged] the amount of a fine to the determination of specified facts."  *Ante,* at 10.  It concludes that "the predominant practice was for such facts to be alleged in the indictment and proved to the jury."  *Ibid.*

Putting the question this way invites a circular response.  As is true of the English usury cases, nothing prohibits a legislature from requiring a jury to find a sentencing fact in a particular subset of cases.  And obviously when a State does so, the jury will indeed have to find those facts.  Thus, if, say, 10 States decide to make juries find facts that will set the fine for, say, simple larceny, then jury practice in those States (during, say, the 19th century) will include the jury's finding of those sentencing facts.  But that circumstance tells us only that in those 10 States for those specific statutes the legislatures so required.  It tells us little, if anything, about practices in most States, and it tells us nothing at all about traditional practice in England or 18th-century America.  Nor does a discovery that, say, 10 state legislatures once required juries, rather than judges, generally to set fines tell us about the scope of the Sixth Amendment's constitutional right to trial by jury.  The matter is important because the majority rests its conclusion almost exclusively upon reports of mid-19th-century jury trials in a handful of States, namely Alabama, Illinois, Indiana, Massachusetts, and New Hampshire, and a treatise that bases its statements upon those cases.  *Ante,* at 10–12.

Scholars tell us that in fact there were about 10 States—including Alabama, Illinois, and Indiana—that (after ratification of the Sixth Amendment) enacted statutes that required juries, not judges, to determine a defendant's punishment, including not only the length of a

prison term but also the amount of a fine. See Iontcheva, Jury Sentencing as Democratic Practice, 89 Va. L. Rev. 311, 317 (2003); King, Origins of Felony Jury Sentencing in the United States 78 Chi.-Kent L. Rev. 937, 963 (2003). The courts that considered this practice, however, did not believe that the constitutional right to jury trial compelled it.

Alabama's Supreme Court, for example, explained that its State's jury-sentencing system, which allowed the jury "to determine both the fine and imprisonment," was in derogation of, and created "an innovation upon[,] the rules of the common law, so far as it transfers [those] powers from the court to the jury." *Hawkins* v. *State*, 3 Stew. & P. 63 (1832). Thus, in *State* v. *Garner*, 8 Port. 447 (1839), see *ante,* at 10, the malicious mischief statute at issue said that the offender would "'be fined in such sum as *the jury trying the same may assess*, not exceeding four fold the value of the property injured or destroyed.'" 8 Port., at 448 (emphasis added). The statute, in other words, transferred all sentencing facts to the jury and was not illustrative of 18th-century practice. Further, the statute said that the "'fine shall be paid to the party injured.'" *Ibid.* The court held that it was consequently proper to allege the amount of the property's value in the indictment, not because the State's constitution required any such thing, but because "the fine thus assesse[d] is for the benefit of the injured party"; the case "is, therefore, a *quasi* civil proceeding"; and for that reason "it would be more consonant to the rules of pleading, and to the principles which govern analogous cases, that the indictment should contain an averment of the value of the property." *Ibid.;* Ord, Law of Usury, at 122–123 (usury as quasi-civil proceeding).

Illinois law was similar. Illinois became a jury-sentencing State in 1831. See Iontcheva, *supra,* at 317, n. 28 (citing Act of Feb. 15, 1831, §42, 1830 Ill. Laws 103,

113).    The Illinois Supreme Court subsequently wrote that, even though "at common law . . . juries . . . never were invested with the power of determining the character or extent of the punishment . . . , we are to be governed entirely the provisions and enactments of our code of criminal jurisprudence." *Blevings* v. *People*, 1 Scam. 172 (1835).  And in *Clark* v. *People*, 1 Scam. 117 (1833), see *ante,* at 10, the court made clear that the arson statute at issue

> "ha[d] changed the common law, . . . [that the] fine equal in value to the property burne[d] is imposed as part of the punishment[; hence,] [t]he indictment . . . should have charged the value of the property de- stroyed, [for] otherwise it could not properly have been inquired into by the jury."  1 Scam., at 117.

Indiana was another jury-sentencing State.  Iontcheva, *supra,* at 317, n. 28; King, *supra,* at 937.  Indiana case law decided before Indiana changed its system indicates that the judge could decide certain facts required to set the applicable maximum fine.  *E.g., Morris* v. *State*, 1 Blackf. 37 (1819).  But after Indiana became a jury-sentencing State, its courts held, not surprisingly, that under Indiana law the jury must determine sentencing facts.  See *Ritchey* v. *State*, 7 Blackf. 168, 169 (1844); *ante,* at 10.

Massachusetts presents a special circumstance.  The two Massachusetts cases that the majority cites, *ante,* at 10–11, are larceny cases.  Value traditionally was an element of the crime of larceny—both because larceny was theft of goods that had some intrinsic value and because value distinguished grand larceny from petit larceny—and thus juries traditionally had to determine at least some facts about the value of the property stolen.  See Black- stone 229, 234.  Massachusetts had abolished the distinc- tion between grand and petit larceny before its courts decided the two cases the majority cites.  See *Common-*

*wealth* v. *Smith*, 1 Mass. 245, 246 (1804).  But those decisions nonetheless rest in significant part upon the jury's traditional larceny factfinding role.  In *Hope* v. *Commonwealth*, 9 Metcalf 134 (1845), for example, the Massachusetts Supreme Judicial Court wrote:

> "The well settled practice, familiar to us all, has been that of stating in the indictment the value of the article alleged to have been stolen. . . . The reason for requiring this allegation and finding of value may have been, originally, that a distinction might appear between the offences of grand and petit larceny . . . . Our statutes . . . prescribe the punishment for larceny, with reference to the value of the property stolen; and for this reason, as well as because it is in conformity with long established practice, the court are of opinion that the value of the property alleged to be stolen must be set forth in the indictment." *Id.,* at 136–137.

The "long established practice" to which the court refers is *larceny* case practice, not practice in all criminal cases.

The New Hampshire case to which the majority refers, *State* v. *Goodrich*, 46 N. H. 186 (1865), *ante,* at 11, is also a larceny case that relied on the "established" larceny case practice.  The court explained:

> "The indictment ought to state the value of the articles stolen that it may appear whether the offence be grand or petit larceny, and such we believe is the settled practice. . . . It has been held in some jurisdictions, that, in case no value is alleged, the offence charged may be regarded as simple larceny, and a conviction be had accordingly . . . but we think it best to adhere to the well established doctrine in such cases . . . . It may also be suggested, that, in the case of simple larceny, the respondent may be sentenced to pay the owner of the goods stolen, treble the value thereof, which is an additional reason for requiring

the character of the offence to be stated." 46 N. H., at 187–188.

The court wrote nothing to suggest that its holding rested on generally applicable constitutional grounds. And it was in the *New Hampshire* federal circuit court a half-century earlier when Justice Story had indicated that the Federal Constitution did *not* impose any such requirement. See *Mann*, 26 F. Cas., at 1155 (No. 15,718).

That leaves the majority's puzzling 1895 Federal District Court case from Kansas. *United States* v. *Woodruff*, 68 F. 536 (D. Kan. 1895); *ante,* at 11. The circumstances of this case are highly unusual, and the District Court's reasoning as to why no fine could be set seems to have rested on a combination of statutory construction and constitutional principle. See *Woodruff* v. *United States*, 58 F. 766, 767–768 (CC Kan. 1893); *Woodruff*, 68 F., at 538–539. Still, I concede this case to the majority—as the lone swallow that cannot make the majority's summer.

Taken together, the 19th-century cases upon which the majority rests its holding do not show anything about practice in the vast majority of States. They concede that common-law practice was to the contrary. And they tell us little about the meaning of the Sixth Amendment. Even were that not so, I do not understand why these mid-19th-century cases should tell us more about the Constitution's meaning than, say, the common 20th-century practice of leaving sentencing fact determinations to the judge. This Court apparently once approved the latter practice as constitutional. *E.g., McMillan* v. *Pennsylvania*, 477 U. S. 79 (1986); *Almendarez-Torres*, 523 U. S. 224. And these cases seem more closely related to the present topic.

## D

The upshot is that both 18th-century English common law and 18th-century American law typically provided judges with broad discretion to assess fines. The judge,

not the jury, would normally determine fine-related sentencing facts. In this respect, ordinary 18th-century sentencing practice related to fines was unlike sentencing practice in respect to felonies. In the latter case, in *Apprendi*'s view, punishment was normally "fixed" and the judge's sentencing role was consequently minimal. 530 U. S., at 478–480. In the former case, namely fines, the judge's role was not normally minimal, but the opposite. For these reasons, I believe that allowing a judge to determine sentencing facts related to imposition of a fine does not invade the historic province of the jury. The historical test that we set forth in *Ice* is satisfied.

V

In *Ice*, we also took account of the practical extent to which extending *Apprendi*'s rule beyond the "'central sphere of [its] concern'" would "diminish" the States' "role" in "devising solutions to difficult legal problems . . . absent impelling reason to do so." 555 U. S., at 171–172. In particular, we feared that insisting that juries determine the relevant sentencing facts (concerning concurrent, as opposed to consecutive, punishment) would unjustifiably interfere with a State's legislative efforts "to rein in the discretion judges possessed at common law to impose consecutive sentences at will." *Id.,* at 171. It would inhibit (indeed "straightjacke[t]") States seeking to make "concurrent sentences the rule, and consecutive sentences the exception." *Ibid.* We said that we were "unclear how many other state initiatives would fall" if *Apprendi* were extended, and that expansion would be "difficult for States to administer." *Id.,* at 171–172. We believed that these considerations argued strongly against any such "expansion."

Here, the same kinds of considerations similarly argue against "expansion" of *Apprendi*'s rule. Today's decision applies to the States. In the 1950's and thereafter, States

as well as the Federal Government recognized a serious problem in respect to the sentencing of corporations. Fines, imposed as a punishment upon corporate offenders, were both nonuniform (treating identical offenders differently) *and* too often they were set too low. Judges would frequently fine corporations in amounts that failed to approximate the harm a corporation had caused or the gain that it had obtained through its illegal activity, both because often the statutory maximums were low and because often the fines imposed tended to be substantially lower than those maximums. See Gruner, Towards an Organizational Jurisprudence: Transforming Corporate Criminal Law Through Federal Sentencing Reform, 36 Ariz. L. Rev. 407, 408 (1994); Kadish, Some Observations on the Use of Criminal Sanctions in Enforcing Economic Regulations, 30 U. Chi. L. Rev. 423, 435, n. 55 (1963); Nagel & Swenson, Federal Sentencing Guidelines for Corporations: Their Development, Theoretical Underpinnings, and Some Thoughts About Their Future, 71 Wash. U. L. Q. 205, 215 (1993).

Consequently, the authors of the Model Penal Code adopted a model provision stating that, in respect to offenses involving financial gain, a court could impose an alternative "higher" fine "equal to double the pecuniary gain derived from the offense by the offender." Model Penal Code §6.03(5), 10A U. L. A. 259 (2001). New York soon thereafter adopted such a provision. N. Y. Penal Law Ann. §80.10(2)(b) (West 2009). And other States followed New York's example with similar provisions permitting judges to set fines equal to twice the gain to the offender or twice the loss to the victim, thereby helping to diminish disparity while helping potential victims by increasing deterrence. *E.g.,* Conn. Gen. Stat. Ann. §53a–44 (West 2007); Fla. Stat. §775.083(1)(f) (2010). Many of these statutes say in particular that the "court" shall make the finding of gain or loss, in a separate hearing if necessary.

*E.g.,* N. Y. Penal Law Ann. §80.00(3) (West 2009); N. J. Stat. Ann. §2C:43–3(e) (West 2005).

The Federal Government followed suit. In some instances, such as RCRA, where environmental harm likely varies with the length of the violation period, Congress advanced its uniformity and deterrence goals by tying a dollar-limited fine to the length of time during which that violation took place. 42 U. S. C. §6928(d)(2)(A). In other instances, it did so through a new general gain-or-loss provision, applying to all offenses, including such crimes as corporate fraud, antitrust violations, and environmental pollution. That provision says:

> "ALTERNATIVE FINE BASED ON GAIN OR LOSS.—If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." 18 U. S. C. §3571(d).

To apply *Apprendi'*s rule to the fines set forth in such statutes, no less than in *Ice*, would weaken or destroy the States' and Federal Government's efforts "to rein in the discretion judges possessed at common law," *Ice*, 555 U. S., at 171, over fines. Congress, in enacting such statutes, expected judges, not juries, to determine fine-related sentencing facts because doing so will often involve highly complex determinations. Where, say, major fraud is at issue, the full extent of the loss (or gain) may be unknown at the time of indictment or at any other time prior to the conclusion of the trial. And in an antitrust or an environmental pollution case, the jury may have particular difficulty assessing different estimates of resulting losses.

The consequence of the majority's holding, insisting that juries make such determinations, is likely to diminish the

fairness of the criminal trial process. A defendant will not find it easy to show the jury at trial that (1) he committed no environmental crime, but (2) in any event, he committed the crime only on 20 days, not 30. Moreover, the majority's holding will sometimes permit prosecutors to introduce newly relevant evidence that would otherwise have been kept from the jury on the ground that it was cumulative or unduly prejudicial. If victims' losses are relevant, the prosecutor may be able to produce witness after witness testifying only about the amount of life savings lost to the fraud. The defendant in this case, for example, thought the introduction of evidence about the discovery of mercury and remediation and evacuation of a nearby apartment complex was unduly prejudicial. Brief for United States 51 (citing App. 15 (defendant's motion in limine to exclude such evidence)). But even if that were so, that evidence might now be admitted as showing the amount of harm caused or the number of days upon which the defendant's unlawful activity took place.

Administrative problems here may prove more serious than where, as in *Apprendi*, prison terms were at stake. In part, that is because corporate criminal cases often focus upon complex frauds, criminal price fixing, extended environmental pollution, food-and-drug safety violations, and the like. Both Congress and the Sentencing Commission have recognized as much. The federal criminal fine statute to which I earlier referred specifically creates an exception where assessing total loss or gain "would unduly complicate or prolong the sentencing process." 18 U. S. C. §3571(d). Similarly, Sentencing Guidelines applicable to corporations exclude fine provisions for environmental crimes (along with most crimes involving export violations, food-and-drug safety, agricultural-and-consumer products, and RICO violations) because of the "potential difficulty . . . of defining and computing loss." Nagel & Swenson, *supra,* at 256; see USSG §8C2.1, and comment.,

§8C2.10. Where the defendant is a human being, the Government can avoid problems of proof simply by abandoning any effort to obtain a fine; instead, perhaps to the individual defendant's dismay, the prosecution can seek a longer prison term. Where the criminal defendant is a corporation, however, no such possibility exists.

If, as seems likely, it becomes too difficult to prove fine-related sentencing facts to a jury, legislatures will have to change their statutes. Some may choose to return to highly discretionary sentencing, with its related risks of nonuniformity. Others may link conviction with fines specified in amount, rather like the 10th-century pre-Norman system of three cows for perjury or more modern mandatory minimum penalties. As Blackstone pointed out, those systems produce sentences that are not proportionate; they tend to treat alike offenders who committed the same crime in very different ways. See 4 Blackstone 371–372.

The majority believes that 10 years of experience with *Apprendi* "attenuate[s]" any legal claim of reliance on different rule of constitutional law here. *Ante,* at 16. Perhaps so. Perhaps that experience shows that *Apprendi'*s jury trial requirement is workable. But there is another less optimistic possibility.

Perhaps that experience, like the canary in a mineshaft, tells us only that our criminal justice system is no longer the jury-trial-based adversarial system that it once was. We have noted that "[n]inety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." *Missouri* v. *Frye,* 566 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 7). We have added that today "'plea bargaining" is "not some adjunct to the criminal justice system; it is the criminal justice system.'" *Ibid.* (quoting Scott & Stuntz, Plea Bargaining as Contract, 101 Yale L. J. 1909, 1912 (1992)). And in such a system, complex jury trial requirements may affect the strength of a

party's bargaining position rather than the conduct of many actual trials.

At the same time, the prosecutor in such a system, perhaps armed with statutes providing for mandatory minimum sentences, can become the ultimate adjudicator. The prosecutor/adjudicator plays an important role in many "European inquisitorial" systems. But those prosecutors, unlike ours, typically are trained formally to be more like neutral adjudicators than advocates. Cf. Langbein & Weinreb, Continental Criminal Procedure: "Myth" and Reality, 87 Yale L. J. 1549, 1559 (1978); see, *e.g.,* Ècole Nationale de la Magistrature. Today's holding, by unnecessarily complicating the trial process, may prove workable only because it nudges our system slightly further in this direction. I see no virtue in doing so.

For these reasons, with respect, I dissent.